IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, SOUTHERN DIVISION

UNITED STATES OF AMERICA    )
                            )
        v.                  )    CRIMINAL ACTION NO.
                            )      1:12cr169-MHT
JAMES TIMOTHY TURNER        )          (WO)

OPINION AND ORDER

On March 22, 2013, a federal jury found defendant
James Timothy Turner guilty on every count in a 10-count
indictment.  Turner was convicted of conspiracy to
defraud the United States in violation of 18 U.S.C. § 371
(count one), passing fictitious obligations in violation
of 18 U.S.C. § 514 (count two), aiding and abetting the
passing of fictitious obligations in violation of 18
U.S.C. § 514 and § 2 (counts three through seven),
attempting to interfere with the administration of
internal revenue laws in violation of 26 U.S.C. § 7212(a)
(count eight), failure to file a tax return in violation
of 26 U.S.C. § 7203 (count nine), and false testimony

under oath in a bankruptcy proceeding in violation of 18 U.S.C. § 152(2) (count ten).

This cause is now before the court on Turner's oral motion for judgment of acquittal. At both the close of the government's case and the close of trial, Turner moved for a judgment of acquittal on all counts. This court denied Turner's motion at the close of the government's case, but reserved until after the verdict any ruling on his renewed motion made at the close of trial. In a brief subsequently submitted to the court, Turner addressed only the charges concerning fictitious obligations, counts two through seven. While Turner's motion should be denied as to all counts, this opinion addresses only the counts that arise under the fictitious obligations statute, § 514.

## I.

In 2008 and 2009, Turner was the primary speaker and figurehead at a series of seminars held throughout the United States. The seminars, which typically spanned two

days and took place in hotel conference rooms, promised attendees a solution they desperately needed: a way to make all of their debt disappear.

The key, attendees learned, was a complicated set of documents, colloquially referred to as "Tim's process." Instructions for crafting these documents were intertwined with lectures describing the philosophy behind them, a conspiracy theory of sorts positing that various parts of the United States government (and perhaps even the government itself) are illegitimate.

The court must confess that it is at a loss as to the full contours of this philosophy. Though it was frequently alluded to at trial and referenced in a number of Turner's filings, the logic behind the theory (if such a logic exists) remains elusive. What the court has gathered, however, is this: Seminar attendees were told that the process they were learning would transform them into what Turner called "secured party creditors" or "sovereign citizens." A person who has become a

"sovereign citizen" can then access a special account at the U.S. Department of Treasury.[1]  While this account cannot be used in all respects like regular money (for instance, a person cannot withdraw money from it and make a purchase at a store), it can be used to discharge debts.  However, once accessed, Turner promised, any debt that a "sovereign citizen" owes, including tax debt, could be discharged by funds from this Treasury account.

Attendees of Turner's seminars received both a PowerPoint presentation on how to complete his process and a number of printed hand-outs explaining his method in greater detail.  Each paid an admission fee ranging from $ 100 to $ 300, plus a pre-1964 silver dollar.  Those who wanted still more instruction could buy five-

_____

[1].  One witness, Vincent Robinette, who had attended Turner's seminars and submitted a "bond" according to his instructions, explained the theory this way: "Basically, a secured party creditor would be someone who had filed paperwork to allow them to access a treasury account that everybody has, but very few people know about." Unfortunately, the transcript from this trial is not yet available, and so the court is unable to provide citations to it.

to-ten minute meetings with Turner for $ 50. One attendee who took advantage of this offer testified that a line of up to 20 people waiting for a similar opportunity to meet with him snaked outside of the door.

Each of the six counts of conviction now at issue before the court is grounded in a document that was sent to the U.S. Department of Treasury in accordance with Turner's process. These six documents are, in all material respects, identical. Each is called a "bond" and is addressed to Henry M. Paulson, Secretary of the Treasury, at the United States Department of the Treasury. The "bonds" have certain dressings of officialdom. They are printed on thick paper, include an ornate border, and are written in what appears to be a simulacrum of legalese.

Each bond asserts that its maker has an account "on file" at the Treasury Department that is worth an enormous amount of money: $ 300 million or $ 100 billion. This treasure trove is linked (by uncertain logic) in

some of the bonds to the maker's birth certificate and in others to the maker's Social Security Number. (One seminar attendee, Thomas Frye, explained that bonds based on a birth certificate or Social Security Number "could be basically an unlimited value," and so the precise value of the bond could simply be "made up.") The bonds instructed Secretary Paulson to draw on the Treasury accounts to which the bonds were allegedly connected and use the funds in those accounts to off-set the maker's debts.

While one of the six bonds at issue was submitted by Turner, references the account he claims to have at the Treasury, and seeks to offset his debt, the other five were all filed by seminar attendees according to his instructions (and each bond filed by one of the attendees seeks to offset that attendee's debt). For the bond that he filed, Turner was charged and then convicted under 18 U.S.C. § 514, which makes it a crime for someone, with intent to defraud, to "pass[] ... any false or fictitious

instrument, document, or other item ... purporting ... to be an actual security or financial instrument issued under the authority of the United States."[2]  For the documents that he helped seminar attendees to file, Turner was charged and convicted for aiding and abetting others in violating that statute.

In his brief, Turner does not argue that the bonds are not fictitious within the meaning of the statute or that they were not passed with an intent to defraud. Instead, he argues that the bonds that form the basis for these convictions do not purport to be "issued under the authority of the United States," as required by § 514. Accordingly, Turner contends that submitting them to the Treasury could not have violated the statute.

---

2.  The statute also outlaws fraudulently passing such an instrument where it purports to be issued under the authority of "a foreign government, a State or other political subdivision of the United States, or an organization." 18 U.S.C. § 514(a)(3). However, at issue here is only whether the bonds purported to be issued under the authority of the United States.

## II.

In considering Turner's motion for judgment of acquittal, the court must view the evidence in the light most favorable to the government and determine whether a reasonable jury could have found Turner guilty beyond a reasonable doubt. See United States v. Sellers, 871 F.2d 1019, 1021 (11th Cir. 1989). A jury may choose between all reasonable conclusions that might be drawn from the evidence presented at trial, and the court must accept all reasonable inferences made by the jury. Id.

The question before the court in assessing Turner's motion is one of statutory interpretation. At issue is the meaning of § 514's language specifying that a fictitious document that contravenes the statute is one that "purport[s] ... to be an actual security or other financial instrument[] issued under the authority of the United States." 18 U.S.C. § 514(a)(3). Turner's argument, in broad strokes, is that the bonds that he and his adherents filed do not purport to be issued by the

United States and that they therefore do not purport to be issued under its authority. The government counters that the bonds violate the statute because they attempt to draw on Treasury accounts. This court now decides whether the statute must be read narrowly, as Turner asks, or whether it merits the broader reading given to it by the government.

While a handful of courts has substantively interpreted this statute, none has examined the meaning of the "under the authority of" language in particular. Nevertheless, a few courts have upheld convictions based on facts similar to those in this case. Most recently, in <u>United States v. Levy</u>, No. 12-13234, 2013 WL 1150113 (11th Cir. Mar. 20, 2013), the Eleventh Circuit Court of Appeals considered the applicability of § 514 to a defendant, Raphael Levy, who had created and issued five fictitious money orders that purported to draw on U.S. Treasury accounts, based on similar conspiracy theories to those held and propagated by Turner. The only element

of the statute that Levy contested was intent.   In an unpublished opinion, the appellate court upheld Levy's convictions under § 514 without explicitly considering whether a fictitious document that attempts to draw on a U.S. Treasury account, as the bonds submitted by Turner and his devotees do, purports to be issued under the authority of the United States.   Similarly, in United States v. Getzschman, 81 F. App'x 619 (8th Cir. 2003), the Eighth Circuit Court of Appeals upheld a conviction under § 514 where the defendant used a fictitious document to attempt to draw on a U.S. Treasury account that he claimed he possessed, again based on theories similar to those advanced by Turner.   The court rejected a vagueness challenge that was based in part on the "under the authority of" language, but it did not explain its conclusion that documents that attempt to draw on Treasury accounts purport to be issued under the authority of the United States.

Thus, with little guidance from other courts to light its way, this court begins its interpretation of the statute with the text. <u>See, e.g.</u>, <u>Landreth Timber Co. v. Landreth</u>, 471 U.S. 681, 685 (1985) ("It is axiomatic that the starting point in every case involving construction of a statute is the language itself.") (citations and quotations omitted).

The court first notes that Turner's interpretation of this language (that it requires that the fictitious instrument purport to be issued <u>by</u> the United States) is not necessitated by the text of the statute. While the statute's drafters could have used the phrase "issued <u>by</u> the United States," they did not;[3] instead, the statute's language leaves open by whom the fictitious instrument must purport to have been issued. This suggests that a

_____

3. Examples abound of federal statutes employing the phrase "issued by". <u>See, e.g.</u>, 22 U.S.C. § 283ii(a) (describing an exception for certain "securities <u>issued</u> <u>by</u> the Corporation") (emphasis added); 15 U.S.C. § 1639a(a)(2)(A) (referring to "guidelines <u>issued by</u> the Secretary of the Treasury or his designee") (emphasis added).

fictitious instrument that does not claim that its <u>maker and issuer</u> is the United States can nevertheless purport to be issued under the United States' authority.

Further, the phrase "under the authority of" can include a broader range of meanings than "by."  The word "under" can be defined as "required by," but also as "subject to" or "in accordance with."  Webster's Third New International Dictionary 2487 (2002).  The court does not now decide just how broadly this word can be interpreted in the context of the statute; however, the many  definitions of the word "under" do illustrate that the text does not necessitate reading the statute to address only documents that purport to be issued "<u>by</u>" the United States.

The court now turns to the legislative history. Section 514 was enacted as part of the Financial Instruments Anti-Fraud Act of 1995.  The primary purpose of the legislation was to fill a gap in federal

counterfeiting law.  Senator Al D'Amato, in introducing

the bill, explained its function as follows:

> "Mr. President, over the past several
> years, innovative criminals have
> exploited a loophole in Federal
> anticounterfeiting laws.  These laws do
> not specifically criminalize the
> production or passing of a phone check,
> bond[,] or security if it is not a copy
> of an actual financial instrument.
> Criminals are now making and passing
> completely fictitious financial
> instruments.  These instruments may
> involve, for example, a bank, an asset
> or a security that does not even exist.
> Under existing Federal and State law, in
> order to prosecute a criminal who
> produces or passes a completely
> fictitious instrument, the criminal must
> use the wires or mails, or deposit the
> instrument in a bank.  These laws simply
> do not prohibit the making and passing
> of fictitious financial instruments."

141 Cong. Rec. S9517, S9533-34 (daily ed. Sept. 10, 1996)

(statement of Sen. Al D'Amato).  Given the intended

function of the statute, it is fair to assume that

restrictions that are included in the counterfeiting

statute but that are absent from § 514 can reasonably be

viewed as having been intentionally excluded in order to broaden the scope of punishable conduct.

It is therefore useful to compare the language of § 514 to that in the counterfeiting statute it was designed to supplement. That statute makes it a crime for someone, "with intent to defraud," to "pass[] ... any falsely made, forged, counterfeited, or altered obligation or other security of the United States." 18 U.S.C. § 472 (emphasis added).[4] This phrasing ("of the United States") is notably more specific than the language of § 514. This difference comports with the narrower scope of the counterfeiting statute, which applies to only documents that actually resemble actual, existing United States obligations or securities. See United States v. Parr, 716 F.2d 796, 807 (11th Cir. 1983) (interpreting "counterfeit" to require some similitude

_____

4. This statute was amended in 2001 to raise the statutory maximum for violating it from 15 to 20 years. However, in all other respects, the current language is identical to the version that existed when the fictitious instruments legislation was introduced.

between the false document and an actual obligation or security).

The test that the Eleventh Circuit has applied in determining whether a document is counterfeit is also instructive. In step with "virtually every court of appeals," the Eleventh Circuit concluded that a document is counterfeit when it "bears such a likeness or resemblance to any of the genuine obligations or securities issued <u>under the authority of the United States</u> as is calculated to deceive an honest, sensible and unsuspecting person of ordinary observation and care." <u>United States v. Prosperi</u>, 201 F.3d 1335, 1342 (11th Cir. 2000) (collecting cases) (quotations and citations omitted) (emphasis added). Here, the "under the authority of" language appears in the case language, but with three important differences that restrict its meaning in ways that are left open in § 514.

First, this standard restricts application of the statute to documents that resemble "any of the" genuine

securities issued under United States authority.  Id.  In other words, the counterfeit statute applies to documents that resemble a finite set of actual monetary instruments.  Second, that likeness must be strong enough to deceive a "sensible" person of "ordinary observation and care."  In one of the only cases interpreting § 514, the Ninth Circuit Court of Appeals made particular note of these differences between the counterfeiting law and § 514.  The latter, it observed, both encompasses a broader range of documents--those that "bear[] a family resemblance to genuine financial instruments"--and protects a broader range of victims by dispensing with the "reasonable victim standard" applicable to the counterfeit statute.  See United States v. Howick, 263 F.3d 1056, 1068-69 (9th Cir. 2001).

Third, the counterfeit statute is focused on how the document itself appears: is it similar to an existing financial instrument and could it fool a sensible person?  The fictitious obligations statute, in contrast, is

focused on what the document "appear[s], represent[s], purport[s], or contriv[es] through scheme or artifice" to do. § 514(a)(3).

Thus, in the context of the standard for interpreting the counterfeit statute, "under the authority of the United States" simply describes the finite set of documents that a false instrument itself must emulate well enough to fool a "sensible" victim. In contrast, in the fictitious obligations statute, "under the authority of the United States" has a broader function: it refers to the authority or validity that the false document purports to have.

To summarize, the court concludes that neither the text nor the legislative history supports limiting § 514 to documents that appear to be issued "by" the United States. Instead, to purport to be issued under the authority of the United States, the false document must claim a power or entitlement that is grounded in the authority of the United States. Purporting to be issued

"by" the United States is one way of doing this, but it is not the only way.

Here, it is indisputable that the documents at issue claim to hold some power conferred under the United States' authority. Most significantly, the bonds each allege that an account exists in the United States Treasury that can legally be used to offset the maker's debt. Indeed, the bonds even provide a specific account number. Such an account could only exist and could only be drawn from under the exercise of United States authority.[5]

Moreover, the bonds purport to <u>bind</u> the Secretary of the Treasury to take the action they request, albeit, admittedly, only after a certain time. For instance, the text of one of them reads:

_____

5. The government's expert witness, Matthew Todd Johnson, expressed this opinion in his testimony. He explained that, because the "bonds" are made to the order of the Secretary of the Treasury and "ask[] to access money that is at the U.S. Treasury Department," the bonds suggest that "the Treasury has some sort of ... skin in the game and they're backing it, when, in fact, the Treasury does not."

> "Henry Paulson, the Secretary of the Treasury, the United States Department of the Treasury, shall have Thirty (30) days from the date of receipt of this Bond ... to dishonor this Bond by returning the Bond to the Principal .... Failure to return the Bond as stated shall constitute Acceptance and Honoring of this Bond ... <u>in accordance with the law</u>, by Henry Paulson, the Secretary of the US Treasury, and The United States Department of the Treasury to all of the Terms and Conditions contained herein."

Gov. Ex. 27 (emphasis added). Each of the bonds includes similar language.

Not only does this language explicitly invoke the authority of law, it purports to imbue these documents with a validity that requires the Secretary of the Treasury to accept them as valid in a way that only a document issued under the authority of the United States could do. Indeed, in the sense that they command acceptance in payment of a debt, they appear to be akin to legal tender. The power to deem an instrument legal tender is a power exercised by Congress. <u>See, e.g.</u>, 31 U.S.C. § 5103 (making "United States coins and currency

19

... legal tender for all debts, public charges, taxes, and dues."); <u>The Legal Tender Cases</u>, 110 U.S. 421, 447 (1884) ("[C]ongress has the power to issue the obligations of the United States in such form, and to impress upon them such qualities as currency for the purchase of merchandize and the payment of debts, as accord with the usage of sovereign governments."). Therefore, because the bonds purport to obligate the Secretary of the Treasury, and thus the federal government, to accept them, the implication is that this status was conferred to them under the authority of federal government, which is the only body with the power to do this.

The context in which these "bonds" were drafted is also significant to the court's analysis, since it sheds light on what authority the bonds purport to have. In Turner's seminars, he explicitly instructed that these documents would be effective precisely <u>because</u> they were lawful. In other words, Turner insisted that crafting

these bonds in a particular manner would so powerfully invoke the law that the Secretary of the Treasury would have no choice but to honor them. In a videotape of one of Turner's seminars played at trial, Turner described his documents as so powerful that they struck fear in the hearts of federal officials who were bound to comply with them. For the hapless participants in his seminars, most of whom were burdened with debt, the picture he painted must have been an inspiring one: David besting the Goliath of the federal government with secret laws that only the truly clever had been able to decode. This assurance that the documents were lawful had a power of its own; it painted those who drafted them as insiders who had beaten the system at its own game. This aspect of Turner's process may well have been just as compelling as his promise that it would dissolve all of his followers' debts.[6]

_____

6. The court grants that intent in this case is a murkier issue: whether Turner and his followers truly believed these bonds would be effective. At trial, it
(continued...)

Given all of these features, this court concludes that the documents at issue do purport to be issued under the authority of the United States within the meaning of § 514. The true thrust of these bonds is that they lawfully bind the government; this is the basis on which they claim power and validity. However, this is not to say that _any_ document that makes a baseless _request_ to a government agency would violate the statute. One can imagine, for instance, a document that makes a request for some benefit on the basis of a misinterpretation of

---

(...continued)

was difficult to discern whether the court was in the presence of a die-hard conspiracy theorist or a snake-oil salesman. Indeed, the sincerity of Turner's followers at times seemed undeniable; whether because they were deeply gullible or so desperate to find a solution to their financial ills that they blinded themselves to the truth, the government presented witness after witness who had followed Turner with messianic zeal. Even Thomas Frye, who is currently serving a 12-month sentence for the bonds he filed under Turner's instruction, testified that he still does not believe that Turner ever meant to fool the government or anyone else. However, it is not the province of the court to wade into this quagmire; this is the vital and often unenviable task of the jury. In this case, the jury has concluded that Turner acted with an intent to defraud. The court will not upset that conclusion.

the law.  A document like this would be safe from
prosecution for two reasons.  First, a mere request does
not claim to carry some authority to <u>bind</u> the government,
as these  documents do.  Second, § 514 requires an
"intent to defraud."  Thus, to convict, a jury must find
that the defendant fraudulently, and not mistakenly,
claimed authority.[7]

    The difference between a document that would and
would not fall within the scope of § 514 might be better
illuminated by analogy.  Imagine that a person walks into
a bank with a set of documents, which he says demonstrate
that he has an account there and entitle him to withdraw

---

    7.  The Ninth Circuit in <u>Howick</u> made a similar point.
It "reject[ed] the suggeston" that interpreting § 514 not
to include a "reasonable victim" standard would result in
a  "parade  of  horribles  ...  in  which  defendants  are
convicted  of  violating  section  514  for  possession  of
'Monopoly money' and other mock currency."  <u>Howick</u>, 263
F.3d at 1069.  The statute resists such a result because
it  "contains  the  subjective  element  of  'intent  to
defraud,' and, as a practical matter, documents that are
obviously  not  negotiable  instruments  will  rarely  be
employed in a fraudulent scheme to persuade others that
they are negotiable.  Thus, the implausibility of mock
currency may count as circumstantial evidence that the
requisite intent to defraud was not present."

23

$ 10,000 from that account.  Even though this person is, in broad strokes, making a request to the bank, he is also claiming to have documents endowed with the bank's authority and which require the bank to act in a certain way pursuant to that authority; the false documents are meant to both evidence and invoke the power of the bank. The bank is, in essence, in a partnership or contractual relationship with him.  Now imagine that a man walks into a bank and says that he has heard that the bankers are very generous and asks for $ 10,000.  While this second man also makes a request, he does so without any claim of entitlement to these funds and without any representation that the bank has already authorized and is required to give him the gift.  Turner, like the first man, claims that the government has so authorized his request (and, indeed, is in partnership or contractual relationship with him) that the government is actually bound to take certain actions at Turner's command.  His actions thus

differentiate him from a person who does not claim any such entitlement to have his request honored.

The court cautions that its decision today should not be read to define the precise limits of application for § 514. Indeed, this court believes it would be injudicious to attempt to define the full universe of the statute based on one set of facts and without the experience and wisdom of other courts that have attempted to apply to statute to other and differing circumstances over time. Instead, the court simply finds that Turner's actions are well within the ambit of § 514; therefore, his convictions must stand.

***

Accordingly, it is ORDERED that defendant James Timothy Turner's oral motion for judgment of acquittal, made on March 21, 2013, is denied.

DONE, this the 21th day of June, 2013.

        /s/ Myron H. Thompson
    UNITED STATES DISTRICT JUDGE